UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JASON VASQUEZ,<br>　　Plaintiff | :<br>:<br>:  CIVIL ACTION NO:<br>:<br>V.　　　　　　　　　　　　　　　　　　 :<br>:<br>THE UNITED ILLUMINATING COMPANY :<br>d/b/a AVANGRID/AVANGRID NETWORKS, :<br>INC.,and UTILITY WORKERS UNION OF :<br>AMERICA LOCAL 470-1, AFL-CIO　　　 :<br>　　Defendants　　　　　　　　　　　　 :  January 19, 2026<br>　　　　　　　　　　　　　　　　　　　 : |

## COMPLAINT

**NATURE OF THE ACTION**

1. This is a "hybrid" action under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for declaratory, injunctive, and monetary relief to redress Defendant employer's breach of the collective bargaining agreement and Defendant union's breach of its statutory duty of fair representation. These two causes of action are interdependent and must be brought together as established in *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983). This complaint is timely filed within the six-month statute of limitations applicable to hybrid claims, and Plaintiff has exhausted or been excused from exhausting contractual remedies due to the Union's failure to fairly represent him. Plaintiff filed an unfair labor practice charge with the National Labor Relations Board on October 16, 2025.

2. Plaintiff, a Hispanic male power lineman with fifteen years of service, brings this action against Defendants for wrongful termination in violation of the collective bargaining agreement and for the Union's arbitrary, discriminatory, and bad-faith failure to represent him in the grievance process, particularly in light of Plaintiff's candidacy to challenge the incumbent Union President in the October 2025 election.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, which provides an independent basis for federal question jurisdiction over suits for violation of contracts between an employer and a labor organization representing

1

employees in an industry affecting commerce. Federal question jurisdiction does not require any minimum amount in controversy.

4. Section 301 of the LMRA, 29 U.S.C. § 185, authorizes suits for violations of collective bargaining agreements to be brought in any federal district court having jurisdiction over the parties, without regard to the amount in controversy or the citizenship of the parties. The interdependent claims asserted herein—breach of the collective bargaining agreement by the employer and breach of the duty of fair representation by the union—are properly joined in this hybrid action under established federal labor law.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (1) Defendant The United Illuminating Company d/b/a Avangrid/Avangrid Networks, Inc. is located in and conducts substantial business operations in the District of Connecticut, with its principal place of business at 180 Marsh Hill Road, Orange, Connecticut 06477; (2) Defendant Utility Workers Union of America Local 470-1, AFL-CIO is located in Connecticut with its address at P.O. Box 3344, Milford, Connecticut 06460; and (3) a substantial part of the events or omissions giving rise to the claims occurred in Connecticut, including Plaintiff's employment at the Orange facility, the investigation and disciplinary proceedings conducted in Connecticut, and the Union's representation activities in Connecticut.

## **PARTIES**

6. Plaintiff Jason Vasquez is a citizen of the United States and a resident of Stratford, Connecticut. At all relevant times, he was employed by Defendant The United Illuminating Company as a power lineman for approximately fifteen years from June 1, 2010 until his termination on July 25, 2025.

7. Plaintiff was a member in good standing of Defendant Utility Workers Union of America Local 470-1, AFL-CIO throughout his employment with Defendant employer and was covered by the collective bargaining agreement between Defendants effective November 16, 2020 through May 15, 2025 and any successor agreement[s] thereto.

8. Defendant The United Illuminating Company d/b/a Avangrid/Avangrid Networks, Inc. is a public utility corporation organized under the laws of the State of Connecticut with its principal place of business located at 180 Marsh Hill Road, Orange, Connecticut 06477.

9. At all relevant times, Defendant employer was engaged in interstate commerce within the meaning of the National Labor Relations Act and was a signatory to the collective bargaining agreement[s] with Defendant union covering Plaintiff's employment.

10. Defendant Utility Workers Union of America Local 470-1, AFL-CIO is a labor organization with its principal place of business located at P.O. Box 3344, Milford, Connecticut 06460. It maintains physical locations within the various employer physical

locations that employ its members in Orange, New Haven, Stratford, and Milford, Connecticut.

11. At all relevant times, Defendant union was the exclusive collective bargaining representative for Plaintiff and similarly situated employees in the bargaining unit covered by the collective bargaining agreement and owed Plaintiff a statutory duty of fair representation in the processing of grievances and enforcement of the collective bargaining agreement.

### FACTUAL ALLEGATIONS - EMPLOYMENT HISTORY AND BACKGROUND

12. The United Illuminating Company hired Plaintiff on June 1, 2010 as a Lineworker Fifth Class at an hourly wage of $19.38 per hour.

13. Plaintiff successfully completed his probationary period and was moved to regular status on August 29, 2010.

14. Throughout his employment, Plaintiff was a member in good standing of the bargaining unit represented by Defendant Union and covered by successive collective bargaining agreements between Defendants.

15. The collective bargaining agreement governing Plaintiff's employment during the relevant time period was effective November 16, 2020 through May 15, 2025 and any successor agreement[s] thereto.

16. Over his fifteen-year tenure with the Company, Plaintiff progressed through the established career ladder from apprentice positions through increasingly skilled classifications.

17. Plaintiff advanced from Lineworker Fifth Class to Lineworker Fourth Class, Lineworker Third Class, Lineworker Second Class, and ultimately to Lineworker First Class.

18. Plaintiff was promoted to the position of Line Group Leader, a working leader position with supervisory responsibilities.

19. As a Line Group Leader, Plaintiff was responsible for coordinating crew assignments, ensuring job completion, training less experienced linemen, and serving as a mentor to apprentices.

20. Plaintiff's compensation increased commensurate with his promotions and advancement through the occupational classifications.

21. Prior to his termination, Plaintiff had achieved recognition as a journeyman first-class lineman, working leader, mentor, and trainer.

22. On March 14, 2013, Plaintiff received an oral reprimand for a preventable motor vehicle accident involving a line truck bucket striking a tree.

23. On July 18, 2017, Plaintiff received a one-day disciplinary suspension without pay following a positive result on a random DOT drug and alcohol test conducted on May 23, 2017.

24. Following the 2017 suspension, Plaintiff was referred to the Employee Assistance Program and successfully completed treatment.

25. On June 16, 2023, Plaintiff received a written warning related to an incident on March 27, 2023 involving failure to conduct a proper tailboard and delayed reporting of a safety incident.

26. Despite this prior disciplinary history, Plaintiff continued in his employment with the Company and advanced to positions of greater responsibility thus showing that the discipline did not negatively impact his advancement or positive perception within the company.

27. None of Plaintiff's prior disciplinary actions involved timesheet discrepancies, dishonesty, or falsification of records.

28. Plaintiff's fifteen-year work record demonstrates steady advancement through increasingly skilled positions and recognition as a competent, experienced lineman and leader.

29. At the time of the events leading to his termination in 2025, Plaintiff had no active disciplinary matters pending and was performing his duties satisfactorily as a Line Group Leader, continuing to train and mentor other employees in the bargaining unit.

**FACTUAL ALLEGATIONS - THE TERMINATION EVENTS**

30. On June 13, 2025, Plaintiff was assigned to an early morning overhead construction job in Bridgeport, Connecticut with a scheduled start time of 5:00 a.m.

31. Plaintiff was designated as the working leader for the job, with a crew consisting of another working leader and two first-class linemen assigned to work under his direction.

32. At approximately 4:30 a.m. on June 13, 2025, Plaintiff contacted the entire crew by telephone and informed them that he would drive his personal vehicle directly to the job site in Bridgeport to coordinate with police regarding road closures and to locate the exact pole location.

33. Plaintiff's residence in Stratford was approximately five minutes from the Bridgeport job site, whereas driving to the Company's Orange facility to pick up his assigned company truck and then traveling to Bridgeport would have required substantially more time and delayed the 5:00 a.m. start.

34. The other crew members, who were already at the Company's Orange facility, agreed to bring Plaintiff's assigned line truck and the other necessary equipment to the job site.

35. The crew arrived at the job site around 5:30 a.m. with the company trucks and equipment, and work commenced shortly thereafter.

36. The job involved running wire across a street, installing a power bank, and other overhead construction work.

37. The job was completed successfully by approximately 12:30 p.m. to 12:45 p.m., and all work was performed in accordance with Company standards and safety requirements.

38. After the job was completed, the crew members who had driven company trucks returned those trucks to the Company yard in Orange.

39. Because Plaintiff had driven his personal vehicle to the job site, he departed for his residence while the other crew members returned to the Orange facility.

40. The other working leader on the job was responsible for recording and reporting the crew's time for the day, and he sent a text message to all crew members, including Plaintiff, with the time to be reported and the work order number to which the time should be charged.

41. Plaintiff recorded his time in accordance with the instructions provided by the other working leader, as was customary practice for all jobs.

42. On or about June 26, 2025, approximately two weeks after the Bridgeport job, Plaintiff was directed to report to his supervisor's office for a meeting at 2:30 p.m.

43. Plaintiff's supervisor informed him that Human Resources needed to speak with him for a "fact-finding meeting" but did not provide any details about the subject matter of the meeting.

44. The meeting was conducted via videoconference with Human Resources personnel from a remote location.

45. For the first ten minutes of the meeting, no union representative was present because Plaintiff had not been informed that he was the subject of an investigation.

46. During the meeting, Company representatives questioned Plaintiff about the June 13, 2025 job and asked why there was no record of his building access at the beginning or end of the workday despite time being claimed on his timesheet.

47. Plaintiff explained that he had driven his personal vehicle directly to the job site in Bridgeport after notifying the crew at 4:30 a.m., and that he had left the job site directly for home after the work was completed.

48. When asked whether he had notified his supervisor in advance of using his personal vehicle, Plaintiff stated that he had not wanted to call the supervisor at 4:30 in the morning but acknowledged that using personal vehicles for such purposes was not uncommon among employees.

49. After approximately ten minutes, Plaintiff requested union representation, and his supervisor contacted a union representative who joined the meeting for the remainder of the discussion.

50. Company representatives stated they would interview the other crew members and contact Plaintiff if there were any further questions.

51. Plaintiff offered to reimburse the Company for any time discrepancy if his early departure from the job site resulted in him being paid for time he did not work.

52. The other crew members subsequently confirmed to Company investigators that Plaintiff had been present at the job site and that the job had been completed as reported.

53. On July 15, 2025, Plaintiff was called back to his supervisor's office for a second meeting with Human Resources.

54. At this second meeting, Company representatives informed Plaintiff that they had conducted a GPS investigation of his assigned company truck following the June 26 meeting.

55. Company representatives alleged that GPS data showed Plaintiff's truck had been "idling" for extended periods on multiple jobs, including a job in Fairfield the week prior to July 15 and another job in Stratford.

56. Regarding the Fairfield job, Company representatives stated that Plaintiff's truck had been seen idling for over two hours.

57. Plaintiff explained that the Fairfield job had an 8:30 a.m. appointment time, that the work was completed by 12:30 p.m. or 12:45 p.m., and that there were four or five trucks on that job site with multiple working leaders present.

58. Plaintiff stated that after completing the Fairfield job, he went to get lunch at a restaurant, and that his truck was running with the air conditioning on while he completed required daily paperwork, which was standard practice when jobs were completed early with no additional assignments for the day.

59. Company representatives questioned whether Plaintiff knew the Company policy regarding breaks, which provided for a 15-minute break in the morning, a 30-minute lunch period, and a 15-minute break in the afternoon.

60. Plaintiff acknowledged knowing the break policy but explained that the extended idling times were not unusual for employees throughout the fleet when jobs were completed early and no additional work was assigned.

61. Plaintiff's supervisor, who was present at the July 15 meeting, corroborated that when jobs are completed early, it is common practice for trucks to remain at job sites while employees wait for potential trouble calls or additional assignments, and that supervision is aware of truck locations through GPS monitoring.

62. At the conclusion of the July 15 meeting, which ended at approximately 2:45 p.m., Company representatives stated they would be in contact with Plaintiff regarding their findings.

63. At approximately 4:30 p.m. on July 15, 2025, less than two hours after the meeting concluded, Plaintiff received a telephone call from Human Resources and his union representative informing him that he was being suspended indefinitely without pay pending the completion of the investigation.

64. Plaintiff had never previously received any verbal or written warnings regarding truck idling times, completion of jobs ahead of schedule, or any timesheet-related issues during his fifteen years of employment.

65. Plaintiff had never been counseled by his direct supervisor about his work performance, productivity, or time management practices prior to the June 26, 2025 meeting.

66. On July 25, 2025, Plaintiff received a termination letter from the Company signed by Alexis Brauc of Human Resources, effective immediately.

67. The termination letter stated that Plaintiff had been informed of issues surrounding his time reporting at meetings on or about June 26, 2025 and July 15, 2025, and that the Company had conducted an investigation following those meetings.

68. The termination letter stated: "Based on the available evidence, concerns that you were falsifying your timesheets were substantiated and considered to be a violation of the Avangrid Code of Business Conduct and Ethics."

69. The termination letter informed Plaintiff that his last date of employment would be July 25, 2025, that his final paycheck would be paid via direct deposit on July 25, 2025, and that his health benefits would end on July 31, 2025.

70. The Company's termination decision constituted an immediate escalation from no prior discipline for timesheet-related matters to termination, bypassing any progressive discipline steps.

71. At no time did the Company offer Plaintiff a last chance agreement or any alternative to termination.

72. As a result of his termination, Plaintiff lost all wages and salary from July 25, 2025 forward, lost his employer-provided health insurance coverage effective July 31, 2025, and lost all other benefits associated with his employment.

**FACTUAL ALLEGATIONS - COMPARATOR EVIDENCE AND DISPARATE TREATMENT**

73. Following Plaintiff's termination on July 25, 2025, the Company conducted GPS investigations of at least two other employees who were on the same June 13, 2025 Bridgeport job with Plaintiff.

74. The first comparator employee is an African American male, approximately 45 to 53 years of age, who was employed by the Company as a power lineman in the same bargaining unit as Plaintiff.

75. This first comparator's wife is personal friends with the manager of the department, creating a close personal connection between the comparator and Company management.

76. The second comparator employee is a Puerto Rican male, approximately 45 to 53 years of age, who was employed by the Company as a power lineman in the same bargaining unit as Plaintiff.

77. Both comparator employees were subjected to GPS investigations by the Company for allegedly excessive truck idling and timesheet discrepancies on the same June 13, 2025 job that was the initial basis for the investigation into Plaintiff's conduct.

78. Both comparator employees were suspended by the Company following their GPS investigations.

79. Both comparator employees were initially terminated by the Company for the same alleged violations that formed the basis of Plaintiff's termination.

80. After their terminations, Defendant Union negotiated "last chance agreements" with the Company on behalf of both comparator employees.

81. Pursuant to these last chance agreements, both comparator employees were reinstated to their positions with the Company with full back pay and benefits.

82. The last chance agreements allowed both comparators to return to work under specified conditions and terms rather than suffer permanent termination from employment.

83. Defendant Union President Moses Rams personally negotiated and secured the last chance agreements for both comparator employees despite their having been terminated for the identical conduct that resulted in Plaintiff's termination.

84. When Plaintiff requested that the Union seek a similar last chance agreement on his behalf, Union Vice President Tony Zervos explicitly told Plaintiff that Moses Rams "was able to bring them back with last chance agreement" but stated he did not know why Plaintiff was not afforded the same remedy.

85. The Union refused to pursue arbitration of Plaintiff's termination or to seek a last chance agreement for Plaintiff comparable to those obtained for the two comparator employees.

86. The Union's refusal to seek comparable treatment for Plaintiff occurred after Plaintiff had announced his intention to run against Union President Moses Rams in the October 2025 union election.

87. Despite performing identical work on the same job under the same circumstances as the two comparator employees, and despite having comparable or superior disciplinary records, Plaintiff alone was denied the opportunity for reinstatement through a last chance agreement.

88. There was no legitimate, non-discriminatory basis for the Company to offer last chance agreements to the two comparator employees while terminating Plaintiff for identical conduct, nor was there any legitimate basis for the Union to negotiate vigorously on behalf of the comparators while refusing to seek the same remedy for Plaintiff.

89. The disparate treatment of Plaintiff compared to the two similarly situated comparator employees demonstrates that the Company's application of discipline was arbitrary and discriminatory in violation of the collective bargaining agreement's prohibition against arbitrary or capricious use of management rights.

90. The Union's failure to seek equal treatment for Plaintiff, particularly in light of its successful negotiation of last chance agreements for the two comparators, constitutes arbitrary, discriminatory, and bad faith conduct in breach of the Union's duty of fair representation.

## FACTUAL ALLEGATIONS - UNION'S FAILURE TO REPRESENT

91. Throughout Plaintiff's fifteen-year membership in Defendant Union, Moses Rams served as President of Local 470-1, having held that office for approximately twenty years prior to Plaintiff's termination.

92. Defendant Union President Moses Rams is of Cuban descent and had developed close working relationships with Company management during his two decades in office.

93. In or around May 2025, prior to the events leading to his termination, Plaintiff announced his intention to challenge Moses Rams for the position of Union President in the October 2025 union election.

94. Plaintiff was vocal in his criticism of certain practices by Union leadership that he believed were unfair to union members, and many bargaining unit members approached Plaintiff expressing support for his candidacy.

95. Union President Moses Rams became aware through the workplace grapevine that Plaintiff intended to run against him in the October election.

96. During the July 15, 2025 meeting at which Company representatives disclosed the GPS investigation and suspended Plaintiff indefinitely without pay, the Union representative present provided only passive observation and minimal advocacy on Plaintiff's behalf.

97. Following Plaintiff's suspension on July 15, 2025, the Union scheduled a review board meeting to consider whether to pursue arbitration of his termination grievance.

98. On or about August 5, 2025, five days after the review board meeting, Union President Moses Rams telephoned Plaintiff and informed him that the E-board would need to hold a vote at the E-board meeting to determine whether to take the case to arbitration.

99. During that telephone conversation, Plaintiff pleaded with Rams to take the case to arbitration, stating "how can we not fight for this," and Rams responded that he would be in touch after the E-board meeting.

100. The day after the E-board meeting, Plaintiff sent a text message to Bonnie, the Union's Vice President, asking "how did the e-board meeting go?

101. Bonnie responded via text message stating "it's gonna go to membership vote in September," giving Plaintiff the clear impression that the union membership would vote on whether to pursue arbitration.

102. Plaintiff responded "thank you very much" and Bonnie replied "of course, no worries."

103. Approximately one week later, Plaintiff contacted Tony Zervos, the Union's Vice President of Union Stewards, to inquire about soliciting votes from union members for the September membership meeting, and Zervos confirmed that Plaintiff could send text messages to solicit support.

104. Zervos initially confirmed with Moses Rams that Plaintiff could attend the membership meeting when the vote would be held, though Plaintiff would need to step out during the actual voting.

105. Three days before the scheduled September membership meeting, after Plaintiff had sent approximately sixty text messages to union members soliciting their support for arbitration, Tony Zervos called Plaintiff and informed him that he could no longer attend the meeting.

106. When Plaintiff questioned why the prior authorization had been reversed, Zervos stated "I don't know what's going on" and "there's no transparency over here with me."

107. The following day, Tony Zervos called Plaintiff again and informed him that there would be no membership vote at all because the E-board had already made its decision not to pursue arbitration.

108. Plaintiff objected, stating that he had been promised a membership vote via text message from Vice President Bonnie, but Zervos responded that Moses Rams was now telling him the E-board decision was final and no vote would occur.

109. Plaintiff asked Zervos to provide information about what actions the Union had taken in his defense, and after placing Plaintiff on hold, Zervos reported that the only action he could find was that an email had been sent requesting the review board meeting weeks earlier.

110. Plaintiff requested access to the E-board meeting minutes to understand what had been discussed regarding his case.

111. Tony Zervos informed Plaintiff that Moses Rams had instructed him that the Union did not have to provide meeting minutes to Plaintiff because "you're no longer in the union" following his termination.

112. At no time did the Union file a formal grievance demanding arbitration of Plaintiff's termination under the procedures set forth in Article XVI of the collective bargaining agreement.

11

113. The Union's refusal to pursue arbitration and its denial of access to meeting minutes occurred after the Union had successfully negotiated last chance agreements for the two comparator employees who were terminated for identical conduct on the same job.

114. When Plaintiff questioned why he was not afforded a last chance agreement like the two comparators, Tony Zervos explicitly acknowledged "those guys were terminated, and Moses was able to bring them back with last chance agreement" but stated he had no idea why the same remedy was not pursued for Plaintiff.

115. The Union's failure to pursue arbitration or seek a last chance agreement for Plaintiff, while simultaneously securing reinstatement for two similarly situated employees, served no legitimate union interest and was arbitrary, discriminatory, and in bad faith.

116. The Union's conduct in initially promising a membership vote, then canceling Plaintiff's attendance at the meeting, then eliminating the membership vote entirely, and finally refusing to provide meeting minutes or pursue arbitration, demonstrated a pattern of arbitrary decision-making and lack of transparency.

117. The Union's disparate treatment of Plaintiff compared to the two comparator employees, combined with the timing of these actions following Plaintiff's announcement of his candidacy against the incumbent Union President, establishes that the Union's failures were motivated by discriminatory animus and personal hostility toward Plaintiff rather than any good faith assessment of the merits of his grievance.

118. On October 16, 2025, Plaintiff filed an unfair labor practice charge with the National Labor Relations Board alleging that Defendant Union had failed to fairly represent him, stating in the charge that "Myself & others were Suspended/Terminated, They All were brought back to Work with a LAST chance Agreement Letter & I was Not Afforded The SAME."

**FACTUAL ALLEGATIONS - COLLECTIVE BARGAINING AGREEMENT PROVISIONS**

119. At all times relevant to this action, the collective bargaining agreement between Defendant employer and Defendant union effective November 16, 2020 through May 15, 2025 and any successor agreement[s] thereto was in full force and effect and governed the terms and conditions of Plaintiff's employment.

120. Plaintiff was at all relevant times a member of the bargaining unit covered by the collective bargaining agreement[s] and entitled to all rights, protections, and procedures established therein.

121. Article XI of the collective bargaining agreement, titled "Management," provides that while the Company retains the right to exercise regular and customary functions of

management, including the right to suspend or discharge for proper cause, "[t]he provisions of this Article shall not be used arbitrarily or capriciously as to any employee or for the purpose of discriminating in any manner against the Union or its members."

122. The collective bargaining agreement thus imposes an express contractual limitation on the employer's exercise of management rights, prohibiting arbitrary, capricious, or discriminatory application of discipline against bargaining unit employees.

123. Article XVI of the collective bargaining agreement establishes a mandatory grievance and arbitration procedure for resolving disputes between the parties.

124. Article XVI, Section 2 specifically provides that "[t]he Union shall have the right to submit a grievance involving suspension, layoff, or discharge directly to a Board of Review in accordance with the provisions of Section 1(c) and said Board of Review shall be convened not more than five days after the grievance is submitted."

125. Article XVI, Section 3 of the collective bargaining agreement provides that "[t]he question of whether or not the Company shall pay the employee back pay for the period covered by such suspension, discipline, layoff or discharge if such suspension, discipline, layoff or discharge shall ultimately be held to have been wrongful may be considered as part of the grievance."

126. Article XVI, Section 1(d) provides that unresolved grievances may be submitted to arbitration through the American Arbitration Association, with the arbitrator's decision to be final and binding on all parties.

127. Article XVII of the collective bargaining agreement, titled "Equal Employment Opportunity," provides that "[t]he Company and the Union endorse the principles and objectives of the state and federal equal employment opportunity laws" and that both parties "will cooperate affirmatively to ensure that the terms and conditions of this Agreement will be administered without discrimination in regard to, but not limited to the following protected classes: race, color, religion, age, sex, sexual orientation, marital status, national origin, disability, genetic information, AIDS/HIV, gender identity or expression, citizen status, and protected veteran status."

128. These provisions of the collective bargaining agreement applied to Plaintiff as a member of the bargaining unit represented by Defendant union throughout his employment with Defendant employer and at all times relevant to the claims alleged herein.

129. The collective bargaining agreement required the employer to exercise its disciplinary authority in a non-arbitrary, non-capricious, and non-discriminatory manner, and required the union to fairly represent bargaining unit members in the enforcement of these contractual protections through the grievance and arbitration procedures.

130. Article XI of the collective bargaining agreement expressly provides that the Company has "the right to hire, suspend or discharge for proper cause," thereby establishing a just cause standard for all disciplinary actions including termination of employment.

131. Under the collective bargaining agreement, the employer is prohibited from terminating bargaining unit employees without proper cause and without following the contractual grievance procedures established in Article XVI.

132. These contractual provisions establish both substantive limitations on the employer's disciplinary authority (prohibition on arbitrary, capricious, or discriminatory discipline and requirement of proper cause) and procedural protections (mandatory grievance and arbitration procedures with potential back pay remedies) that were binding on Defendants and applied to Plaintiff throughout his employment with the Company.

## **COUNT I: BREACH OF COLLECTIVE BARGAINING AGREEMENT (Against Defendant Employer)**

133. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

134. This count alleges breach of the collective bargaining agreement in violation of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), and is pled in conjunction with Count II (breach of duty of fair representation) as the two claims are interdependent under *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983).

135. The collective bargaining agreement between Defendants, effective November 16, 2020 through May 15, 2025 and any successor agreement[s] thereto, established substantive limitations on Defendant employer's disciplinary authority and procedural protections for bargaining unit employees including Plaintiff.

136. Article XI of the collective bargaining agreement expressly prohibited Defendant employer from using management rights "arbitrarily or capriciously as to any employee or for the purpose of discriminating in any manner against the Union or its members."

137. Article XI further provided that Defendant employer had "the right to hire, suspend or discharge for proper cause," thereby establishing a just cause standard for all disciplinary actions including termination.

138. Article XVI established mandatory grievance and arbitration procedures for resolving disputes involving suspension or discharge, with provisions for back pay and other remedies if discipline was ultimately determined to be wrongful.

14

139. Article XVII required both Defendant employer and Defendant union to administer the terms and conditions of the collective bargaining agreement "without discrimination" with regard to protected classes including race and national origin.

140. Defendant employer breached the collective bargaining agreement by terminating Plaintiff on July 25, 2025 without just cause and without proper cause as required under Article XI.

141. Defendant employer's termination of Plaintiff for alleged falsification of timesheets and violation of the Code of Business Conduct was pretextual, arbitrary, and discriminatory.

142. Defendant employer's stated reasons for termination—GPS data showing "excessive idling" and alleged timesheet discrepancies on the June 13, 2025 job—were applied arbitrarily and used as a pretext for discriminatory discharge.

143. Defendant employer terminated Plaintiff for conduct identical to that of two other bargaining unit employees on the same June 13, 2025 job, yet offered those two comparator employees last chance agreements and reinstatement while denying Plaintiff any opportunity for reinstatement.

144. This disparate treatment of similarly situated employees violates the collective bargaining agreement's prohibition against arbitrary, capricious, and discriminatory application of management rights under Article XI.

145. Plaintiff had no prior disciplinary history involving timesheet discrepancies, dishonesty, or falsification, and had never received any warnings regarding truck idling times or time management practices during his fifteen years of employment.

146. Defendant employer failed to utilize progressive discipline proportionate to any alleged infraction and instead escalated immediately from no prior timesheet-related discipline to termination, the ultimate penalty.

147. Defendant employer violated its duty under the collective bargaining agreement to exercise management rights in good faith and without discrimination by imposing the harshest possible penalty on Plaintiff while granting leniency to two similarly situated comparator employees.

148. Plaintiff would have pursued his termination grievance through the contractual grievance and arbitration procedures established in Article XVI of the collective bargaining agreement, but was prevented from doing so by Defendant union's breach of its duty of fair representation as alleged in Count II herein.

149. The union's refusal to file a formal grievance, its cancellation of the promised membership vote, and its failure to demand arbitration or negotiate a last chance

agreement on Plaintiff's behalf rendered the contractual remedies futile and prevented Plaintiff from vindicating his rights under the collective bargaining agreement.

150. As a direct and proximate result of Defendant employer's breach of the collective bargaining agreement, Plaintiff has suffered and continues to suffer damages including but not limited to: lost wages and salary from July 15, 2025 (date of suspension) through the present and continuing into the future; loss of health insurance benefits effective July 31, 2025; loss of pension benefits and contributions; loss of seniority rights; emotional distress, humiliation, and damage to professional reputation; and other economic and non-economic damages.

151. Plaintiff is entitled to all remedies available under Section 301 of the LMRA and the collective bargaining agreement, including reinstatement to his former position with full back pay, restoration of all benefits and seniority, compensatory damages, and such other relief as the Court deems just and proper.

**COUNT II: BREACH OF DUTY OF FAIR REPRESENTATION** (Against Defendant Union)

152. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

153. This count alleges breach of the duty of fair representation in violation of federal labor law as interpreted under the National Labor Relations Act and Railway Labor Act, and is pled in conjunction with Count I (breach of collective bargaining agreement) as the two claims are interdependent under *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983), and *Vaca v. Sipes*, 386 U.S. 171 (1967).

154. At all times relevant to this action, Defendant Utility Workers Union of America Local 470-1, AFL-CIO was the exclusive bargaining representative for Plaintiff and all other employees in the bargaining unit covered by the collective bargaining agreement with Defendant employer.

155. As the exclusive bargaining representative, Defendant union owed Plaintiff a statutory duty of fair representation to represent him fairly, in good faith, and without arbitrary, discriminatory, or bad faith conduct in the processing of grievances and enforcement of the collective bargaining agreement.

156. The duty of fair representation is implied under the scheme of the National Labor Relations Act and requires the union to serve the interests of all members without hostility or discrimination, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).

157. A union breaches its duty of fair representation when its conduct toward a member is arbitrary, discriminatory, or in bad faith, as established by controlling Supreme Court precedent.

158. Defendant union's conduct toward Plaintiff was arbitrary in that it refused to arbitrate Plaintiff's termination grievance without any legitimate reason, failed to adequately investigate the merits of his grievance, and provided only minimal representation during critical meetings with management.

159. Defendant union provided minimal representation at the June 26, 2025 fact-finding meeting, arriving only after Plaintiff had been questioned for approximately ten minutes without union representation, and thereafter provided only passive observation with minimal advocacy.

160. Defendant union provided minimal representation at the July 15, 2025 meeting at which Plaintiff was suspended indefinitely, failing to challenge the employer's GPS investigation or advocate for alternative discipline short of suspension and termination.

161. Defendant union failed to file a formal grievance demanding arbitration under Article XVI of the collective bargaining agreement despite the clear contractual right to submit termination grievances directly to a Board of Review and ultimately to binding arbitration.

162. Defendant union's conduct was discriminatory in that it treated similarly situated bargaining unit members more favorably than Plaintiff by negotiating last chance agreements for two comparator employees who were terminated for identical conduct while refusing to seek the same remedy for Plaintiff.

163. Defendant union President Moses Rams successfully negotiated last chance agreements resulting in the reinstatement of two bargaining unit members who had been terminated for GPS-related violations on the same June 13, 2025 job as Plaintiff, yet refused to seek comparable treatment for Plaintiff.

164. Defendant union's discriminatory treatment of Plaintiff was motivated by animus arising from Plaintiff's announced candidacy to challenge Union President Moses Rams in the October 2025 election, as Rams had held his position for approximately twenty years and viewed Plaintiff as a political threat.

165. Defendant union's conduct was in bad faith in that it promised Plaintiff a membership vote on whether to pursue arbitration, then cancelled his attendance at the meeting, then eliminated the membership vote entirely, demonstrating intentional deception and a predetermined decision not to represent him.

166. When Plaintiff requested information about what actions the Union had taken in his defense, Union Vice President Zervos reported after investigation that the only action taken was sending an email requesting a review board meeting, demonstrating the Union's failure to adequately investigate or advocate for Plaintiff's rights.

167. But for Defendant union's breach of its duty of fair representation, Plaintiff would have prevailed in arbitration or obtained a last chance agreement comparable to those negotiated for the two similarly situated comparator employees, as the employer's termination was arbitrary and discriminatory and lacked just cause under the collective bargaining agreement.

168. Defendant union's breach of duty prevented Plaintiff from vindicating his contractual rights under the collective bargaining agreement and rendered the contractual grievance and arbitration procedures futile, thereby preventing Plaintiff from obtaining the remedies to which he was entitled under the agreement.

169. As a direct and proximate result of Defendant union's breach of its duty of fair representation, Plaintiff has suffered and continues to suffer damages for which Defendant union is liable in the amount proven at trial, including but not limited to: increased damages resulting from the union's failure to properly process his grievance; loss of wages and benefits that would have been recovered through successful arbitration or a last chance agreement; emotional distress; and other economic and non-economic damages.

170. Plaintiff is entitled to all remedies available for breach of the duty of fair representation, including compensatory damages for losses attributable to the union's breach, and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

A. Declaratory relief finding that Defendants violated Plaintiff's rights under Section 301 of the Labor Management Relations Act;

B. Injunctive relief ordering Plaintiff's reinstatement with full seniority and benefits, or in the alternative, front pay;

C. Back pay from July 15, 2025 through judgment, less interim earnings;

D. Restoration of all benefits including health insurance, pension contributions, and seniority;

E. Compensatory damages for emotional distress and other harms, in an amount to be determined at trial;

F. Pre-judgment and post-judgment interest as allowed by law;

G. Attorneys' fees and costs; and

H. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 19th day of January, 2026

        THE PLAINTIFF,
        JASON VASQUEZ
        Respectfully submitted,

        /s/ *Eric R. Brown*
        Eric R. Brown (CT 13519)
        Law Office of Eric R. Brown
        P.O. Box 615
        Watertown, CT 06795
        888-579-4222 (tel.)
        888-579-4222 (fax)
        eric@thelaborlawyer.com (email)